UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ART-IN INTERNET TECHNOLOGIES &<br>ELECTRONIC COMMERCE LTD., and<br>ART-IN HOSTING & SUPPORT<br>SERVICES, LTD.,<br><br>Defendants. | CIVIL ACTION NO. 05-10132-DPW |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Akamai Technologies, Inc. ("Akamai") brings this Complaint against

defendants Art-In Internet Technologies & Electronic Commerce Ltd. and Art-In Hosting

& Support Services, Ltd. (collectively, "Art-In").

## The Parties

1.      Plaintiff Akamai is a Delaware corporation with its principal place of

business in Cambridge, Massachusetts.

2.      Defendants Art-In Internet Technologies & Electronic Commerce Ltd. and

Art-In Hosting & Support Services, Ltd. are corporations governed by the laws of the

State of Israel.  Upon information and belief, both defendants are under receivership.

Their current address is:  Receiver, Adv. Aharon Ben Shahar, Ben Shahar, Lekner &

Co. Law Offices, 2 Hashlosha Street, Tel Aviv 67060, Israel.

### Jurisdiction and Venue

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action is between a citizen of a state and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.      Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the instant claims occurred within this judicial district.

### Background

5.      Akamai and Art-In entered into a Second Amended and Restated Akamai Services Reseller Agreement dated as of April 18, 2002 (the "Agreement").  A copy of the Agreement is attached as Exhibit A.

6.      Pursuant to the Agreement, Akamai provided services to Art-In for the purpose of Art-In reselling these services on a non-exclusive basis to third-parties. These services included Akamai's "FreeFlow," "EdgeScape," "FirstPoint," and "EdgeSuite" services.  These services make it significantly faster for persons using websites of Akamai's customers to access and navigate these websites.

7.      Section 8.3 of the Agreement states in part:  "Amounts due hereunder are payable 90 (90) days from the date of invoice for resellers existing Akamai customers as are listed under Schedule H and sixty (60) days from the date of invoice for any new customers signed after the date of this contract ("Invoice Due Date").  Reseller agrees to pay a late charge of 1.5% for each month or part of the month (or the maximum lawful rate allowed by law, whichever is less) for all amounts not paid by the Invoice

2

Due Date. . . . If Reseller fails to pay any fee, expense, tax or any sum due Akamai, Reseller shall pay on demand all reasonable expenses incurred by Akamai in collecting these sums, including reasonable legal fees."

8.    By letter dated February 18, 2003, Akamai terminated the Agreement pursuant to Section 11 of the Agreement.  A copy of this letter is attached as Exhibit B.

9.    Section 14.7 of the Agreement states in part:  "This Agreement shall be interpreted according to the laws of the Commonwealth of Massachusetts without regard to or application of choice-of-law rules or principles.  Any action to enforce, arising out of, or relating in any way to, any of the provisions of this Agreement may be brought and prosecuted in the exclusive jurisdiction of either the state or federal courts located in the Commonwealth of Massachusetts as is provided by law; and the parties irrevocably consent to the personal and exclusive jurisdiction and venue of these courts located in the Commonwealth of Massachusetts and to service by registered mail, return receipt requested, or by other manner provided by law."

10.    Section 14.16 of the Agreement states in part:  "Reseller agrees, without objection, to the choice of law provision as set forth in Section 14.7 of this Agreement . . ."

## COUNT I

### (Breach of the Agreement)

11.    Akamai incorporates by reference all preceding paragraphs of this Complaint.

12.    Akamai performed all of its obligations under the Agreement.

13.    Art-In breached the Agreement by, _inter alia_, failing to pay in full the invoices issued pursuant to the Agreement.  Attached as Exhibit C is a list of Akamai's invoices issued to Art-In from February 2001 through March 2003, together with a list of the corresponding payments.  The outstanding unpaid balance of these invoices is $671,960.58.

14.    Akamai has suffered damages as a result of Art-In's breaches of the Agreement.  Akamai's damages include: (1) the principal sum of $671,960.58; (2) accruing interest as provided in the Agreement in the amount of 1.5% per month; and (3) Akamai's reasonable attorneys' fees, costs, and expenses as provided in the Agreement.

4

**WHEREFORE**, Akamai Technologies, Inc. respectfully requests judgment in its

favor against defendants Art-In Internet Technologies & Electronic Commerce Ltd. and

Art-In Hosting & Support Services, Ltd., jointly and severally, as follows:

A.     For the principal sum of $671,960.58;

B.     For accruing interest in the amount of 1.5% per month;

C.     For Akamai's reasonable attorneys' fees, costs, and expenses; and

D.     For any and all other relief that the Court deems just and proper.


### JURY DEMAND

Akamai requests a trial by jury on all issues so triable.

Respectfully submitted,

AKAMAI TECHNOLOGIES, INC.
By its attorneys,


Frederic D. Grant, Jr.
 BBO No. 543115
727 Atlantic Avenue, Second Floor
Boston, Massachusetts 02111
Tel:    617-357-6555
Fax:   617-357-5030
grant@grantboston.com

— and —

George B. Hofmann
 BBO No. 648452
PARSONS KINGHORN HARRIS, PC
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
(801) 363-4300

Dated:   March 24, 2005

5

*EXHIBIT A*

SEP-26-2002 THU 01:50 PM                          FAX NO.

SECOND AMENDED AND RESTATED
AKAMAI SERVICES RESELLER AGREEMENT

BY AND BETWEEN

AKAMAI TECHNOLOGIES, INC.
500 TECHNOLOGY SQUARE
CAMBRIDGE, MASSACHUSETTS, U.S.A. 02139

("AKAMAI")

AND

ART-IN INTERNET TECHNOLOGIES & ELECTRONIC COMMERCE LTD
15 BEZALEL ST.
RAMAT- GAN 52521, ISRAEL
PHONE: 972-3-6111711
FAX: 972-3-6111712

("RESELLER")

RESELLER CONTACT

| | |
|---|---|
| Name: | Diego Schaiquevich |
| Title: | CEO |
| Phone: | 972-3-6111711 |
| Fax: | 972-3-6111712 |
| Email: | diegos@art-in.com |

RESELLER CONTACT FOR NOTICES

| | |
|---|---|
| Name: | Diego Schaiquevich |
| Address: | Address: 15 Bezalel St. |
| | Ramat-Gan 52521, Israel |
| Phone: | 972-3-6111711 |
| Fax: | 972-3-6111712 |

AKAMAI CONTACT

| | |
|---|---|
| Name: | Peter Spiliakos |
| Title: | Senior Director, Worldwide Channels |
| Phone: | 617-250-4742 |
| Fax: | 617-444-3694 |
| Email: | peter@akamai.com |

AKAMAI CONTACT FOR NOTICES

General Counsel
500 Technology Square
Cambridge, Massachusetts, U.S.A. 02139
Phone: 617-250-3000
Fax: 617-250-3695

## SECOND AMENDED AND RESTATED
## AKAMAI SERVICES RESELLER AGREEMENT

This SECOND AMENDED AND RESTATED AKAMAI SERVICES RESELLER AGREEMENT, consisting of the terms and conditions set forth below and the attached Schedules, each of which is incorporated into and made a part hereof by this reference (this "Agreement"), is entered into as of the 18 day of April, 2002 (the "Effective Date"), by and between AKAMAI TECHNOLOGIES, INC., a Delaware corporation ("Akamai"), having its principal place of business as set forth on the cover page of this Agreement, and ART-IN INTERNET TECHNOLOGIES & ELECTRONIC COMMERCE LTD., a corporation governed by the laws of the State of Israel, having its principal place of business as set forth on the cover page of this Agreement (the "Company"), for itself and on behalf of ART-IN HOSTING & SUPPORT SERVICES LTD., a corporation governed by the laws of the State of Israel and a wholly owned subsidiary of the Company (the "Subsidiary" and together with the Company, the "Reseller").

### BACKGROUND

WHEREAS, Akamai operates a global network of distributed edge servers and related infrastructure (the "Akamai Network") and provides secure, outsourced ebusiness infrastructure services using the Akamai Network and other proprietary technology.

WHEREAS, Akamai and Reseller are parties to an Amended and Restated Akamai Services Reseller Agreement dated as of December 18, 2000 pursuant to which Reseller was authorized to resell Akamai's FreeFlow℠ Services, FreeFlow℠ Streaming Services, EdgeScape℠ Services, FirstPoint℠ Services, and EdgeSuite Services (the "First Amended and Restated Reseller Agreement"); and

WHEREAS, the parties desires to amend and restate the First Amended and Restated Reseller Agreement as of April 18, 2002 (the "Amendment Effective Date") to permit Reseller to (i) appoint Sub-Resellers; and (ii) extend the Reseller's Territory, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Akamai and Reseller agree as follows:

### TERMS AND CONDITIONS

1. APPOINTMENT.

1.1 **Appointment.** Subject to all of the terms and conditions in this Agreement, Akamai appoints Reseller to act during the Term (as defined in Section 11.1) as a non-exclusive reseller authorized to market, resell and support Akamai's proprietary services designated and described on Schedule A (each an "Akamai Service" or collectively, the "Akamai Services") directly to customers of Reseller ("Customers"), and Reseller accepts such appointment. Schedule B attached hereto and incorporated herein by reference herein contains a separate service schedule covering each Akamai Service that Reseller is authorized to market, resell and support (each a "Service Schedule" or collectively, the "Service Schedules") and Reseller agrees

Akamai Technologies, Inc. Confidential
Akamai Services Reseller Agreement – February, 2002

to be bound by any additional terms set forth on the Service Schedules. Akamai may amend Schedule A (and, to the extent necessary, any related Service Schedule) in the event Akamai modifies or discontinues any of its products or services in the normal course of business, by providing Reseller with thirty (30) days advance written notice or a lesser period of time in the event such change or termination is due to any national, state or local laws, rules or regulations. At the request of Reseller, Akamai will provide reasonable assistance to Reseller in addressing such modification or discontinuation during such notice period. In addition, Akamai reserves the right to have some or all of its obligations hereunder provided by a subsidiary or other authorized entity.

### 1.2    Approval and Certification of Sub-Resellers.

(a)    **Approval and Appointment of Sub-Resellers.** Subject to all of the terms and conditions in this Agreement, Reseller is authorized to designate its own channel partners as sub-resellers to market, resell, and support Akamai's Services in Israel only provided they meet the criteria as an Authorized Akamai Sub-Reseller (as defined herein). For each such designated channel partner, Reseller shall inform Akamai of the same and provide Akamai with the company name, address and a single point of contact. Within seven days of receiving such information, or such longer period of time as Akamai may reasonably request, Akamai shall notify Reseller of whether it approves the designation of the channel partner as a sub-reseller under this Agreement, such approval to be granted or withheld by Akamai in its sole determination. Within three months of being approved, and prior to becoming an Authorized Akamai Sub-Reseller, each designated channel partner must undergo the following certification process: 1) be approved by Akamai as set forth above (and be re-approved as set forth below to maintain its certified status) and meet the certification requirements required of Akamai resellers generally, 2) enter into a valid and binding agreement with each Customer containing at a minimum the mandatory terms and conditions set forth in Schedule G (and keep such agreement in effect to maintain its certified status), and 3) have entered into a valid and binding agreement with Reseller which contains at minimum the mandatory terms and conditions set forth in Schedule G (and keep such agreement in effect to maintain its certified status). Such Authorized Akamai Sub-Resellers shall be referred to as "Sub-Resellers" in this Agreement. In the event an approved channel partner is not certified as a Sub-Reseller within three months of being approved for certification, Reseller must again seek Akamai's approval prior to such channel partner undergoing the above four-step certification process.

(b)    **Renewal of Approval.** With respect to each Sub-Reseller, once a year during the term of the applicable Sub-Reseller Terms and Conditions (as defined in Section 2.3), but not earlier than 120 days prior to the end of such term, Reseller must seek Akamai's re-approval of such Sub-Reseller. Akamai may grant or withhold its re-approval only if sub reseller does not meet the minimum standards as outlined in section 1.2. a .If Akamai claims the sub reseller does not meet the mentioned minimum standard in section 1.2.a, Akamai will notify Reseller and point those standards which are not met, and allow the sub reseller to comply with Akamai's observations within 45 days. Immediately after the expiration of the mentioned 45 days Akamai will reconsider its re-approval according to the changes made by sub reseller and if sub reseller still does not meet the minimum standard it will allow reasonable time to the sub reseller to make the necessary changes.  If Akamai notifies Reseller that Akamai does not grant its re-approval, then Reseller shall cause the applicable Sub-Reseller Terms and Conditions to terminate or expire, and Sub-Reseller's status as an sub-reseller of Akamai Services shall terminate, no later than three months from the date of Akamai's notice.

Akamai Technologies, Inc. Confidential
Akamai Services Reseller Agreement - February, 2002

(c)    Escalation Procedure.  In the event Reseller disagrees with Akamai's determination to withhold its approval under Section 1.1.2(a) or withhold its re-approval under Section 1.1.2(b), then, at Reseller's request, the Program Managers (as defined below) for each of the parties shall meet and shall endeavor in good faith to resolve such disagreement.  If the continued discussions of the Program Managers for each of the parties conclude in good faith that amicable resolution through continued discussions does not appear likely, then, at Reseller's request, the matter will be escalated to the Program Director or Vice President level within each of the companies, as agreed upon by the parties, and such senior management shall endeavor in good faith to resolve such disagreement.  In no event will the parties resort to a formal proceeding if the disagreement is not resolved pursuant to the foregoing procedure.

1.3    Territory.  Reseller shall, and shall permit Sub-Resellers to market, resell and support the Akamai Services solely to Customers (i) who are organized under the laws of the countries specifically set forth in Schedule C and (ii) whose origin servers are located in the countries specifically set forth in Schedule C ("Territory").  Schedule C, which is attached hereto and incorporated herein by this reference, may be amended from time to time. For purposes of this Agreement, the term "origin server(s)" shall mean the server(s) from which Customer publishes its Customer Content, or stages its Customer Content for delivery from the Akamai Network. In addition, Akamai reserves the right, in its sole and reasonable discretion, to remove any Territory from Schedule C to the extent Akamai removes such Territory from the standard Akamai Reseller Program.

1.4    No Exclusivity; Freedom of Action. Reseller acknowledges that its appointment under this Agreement is non-exclusive and, except as expressly set forth herein, nothing in this Agreement shall limit in any manner Akamai's marketing, distribution or sales activities or its rights to market, distribute or sell, directly or indirectly, or appoint any other person or company as a dealer, distributor, reseller, licensee or agent for the Akamai Services, within or outside the Territory.  Furthermore, to the extent permitted by law, each party may directly or indirectly (through resellers or otherwise) market, sell, offer or provide any of its respective products or services to any customer of the other party in the Territory during or after the Term, except that during the Term, Reseller shall not knowingly solicit any of Akamai's customers for the purpose of offering Akamai Services to such customers.

1.5    Program Managers.  Each party shall designate a program manager ("Program Manager") who shall supervise the party's activities hereunder including, with respect to Akamai's Program Manager, sales training, support and resource allocation; and, with respect to the Reseller's Program Manager, support and quality control.  All communications and services provided by Akamai in connection with the Reseller Program shall be provided in English. To the extent Reseller requests communications or services to be provided in its local language, Akamai will use commercially reasonable efforts to provide such communications or services in the Reseller's local language; provided, however, such communications or services are at all times subject to availability and Akamai's then-current rates.  A party may change its Program Manager upon notice to the other party's Program Manager. The Akamai Program Manager and the Reseller Program Manager shall each serve as the principal point of contact for the other party for the resolution of any issues or problems that may arise hereunder. Reseller agrees to designate a marketing communications contact, technical lead contact, a director level customer support contact, and an executive contact who owns the relationship. Reseller also agrees to dedicate a single point of contact within management to facilitate the integration of the service and relationship into the organization for a minimum of ninety (90) days from the Effective Date.

4

**1.6    Reseller as Internet Network, Internet Access Provider or Telecommunications Provider.** To the extent that Reseller is an Internet Network, Internet Access Provider or Telecommunications Provider, Reseller shall participate in the Akamai Accelerated Networks Program and shall execute the applicable agreements therefore.

## 2.    CUSTOMERS.

**2.1    Customer Agreements.** All resales of the Akamai Services by Reseller will be subject to the execution and delivery by each Customer of a valid and binding agreement or agreements directly between each Customer and Reseller or Sub-Reseller (the "Customer Agreement"). Each Customer Agreement shall contain terms and conditions consistent with this Agreement, including, without limitation, provisions that are no less protective of Akamai's proprietary rights than the relevant provisions set forth herein. In addition, Reseller or Sub-Reseller shall ensure that each Customer acknowledges and agrees that: (i) Reseller may, subject to Akamai's consent, assign the Customer Agreement (or the portions thereof pertaining to the Akamai Services) to Akamai in the event of the expiration or termination of this Agreement; (ii) use of the Akamai Services shall be subject to Customer's compliance with Akamai's requirements regarding Customer Content (as defined and set forth in Section 6); (iii) Customer may not sell, resell, assign, transfer, distribute, or otherwise provide access to any Akamai Service to any third party; and (iv) Customer shall comply with all applicable laws, regulations, and ordinances relating to its use of the Akamai Services.

**2.2    Service Levels; Credits.** Reseller, in its discretion, may offer, or permit Sub-Resellers to offer, Customers a Reseller-branded or Sub-Reseller-branded, as applicable, service level guarantee for a particular Akamai Service (the "SLA"), provided that any SLA offered by Reseller or a Sub-Reseller shall be substantially identical to the then-current version of the Akamai service level agreement for the applicable Akamai Service as available on the Akamai Customer Portal (currently located under the "Products" section at http://i.am.akamai.com), as the same may be modified and updated by Akamai from time to time. In the event that Reseller chooses to offer an SLA to its Customers for a particular Akamai Service, Reseller may, and may permit Sub-Resellers to, determine in its discretion the amount of credit that would be granted to Customers by Reseller or such Sub-Reseller if the service levels set forth in the SLA are not met. Notwithstanding the foregoing, Akamai's obligation to provide credits to Reseller for a failure to meet an applicable service level with respect to a particular Customer shall be limited to the following: In order for Reseller to request a credit from Akamai for a failure to meet an applicable service level, Reseller must notify Akamai's Program Manager of the request in writing or by email within fifteen (15) days from the date of the alleged failure to meet the applicable service level with respect to a particular identified Customer. Upon receiving a timely request for a credit from Reseller, Akamai will measure the performance, availability and/or other required metrics of the relevant Akamai Service using the methodology set forth in the applicable SLA, and Akamai will provide the results of such measurement to Reseller. In the event that the measurement indicates that the service levels set forth in the SLA were met for the particular Customer, then Reseller shall not be entitled to any credit(s). In the event that the measurement indicates that the service levels set forth in the SLA were not met for a particular Customer, then Akamai shall provide credit(s) to Reseller calculated using the methodology set forth in the SLA. For purposes of determining the amount of the credit(s) to which Reseller is entitled with respect to the particular Customer, all calculations shall be based on the wholesale rate for the relevant Akamai Service then in effect pursuant to the terms of this Agreement. Any credit(s) to which Reseller is entitled under this Section 2.2 in a given month will be applied.

Akamai Technologies, Inc. Confidential
Akamai Services Reseller Agreement – February, 2002

2.3    **Customer Notification.** Within five (5) days of Reseller and a Customer entering into a Customer Agreement and at least fourteen (14) days prior to the Customer's requested billing effective date, Reseller shall complete a Customer Activation Form located under the "Service Orders" section at http://i.am.akamai.com. Reseller shall designate one (1) fully authorized representative who will receive from Akamai an identification name and password that will permit such person to access and complete the Customer Activation Form. Reseller represents, acknowledges and confirms that this representative designated to complete the Customer Activation Form has the legal capacity and authority to bind Reseller to all of the commitments, duties and obligations set forth on the Customer Activation Form without further approval by Reseller. Upon completion of the Customer Activation Form by Reseller, the information, duties, commitments and obligations on the Customer Activation Form shall be incorporated herein by reference and shall be binding on both parties.

2.4    **Customers and Transition Assistance.** Akamai's current customers as of the Effective Date who are also customers of any services of Reseller or Sub-Reseller will remain direct customers of Akamai with respect to the Akamai Services and direct customers of Reseller or Sub-Reseller with respect to Reseller's or Sub-Reseller's services. During the Term, Reseller shall be solely responsible for billing Customers for their use of the Akamai Services and Akamai will provide Reseller with monthly data in a file format to reasonably enable Reseller to bill its Customers separately. After termination or expiration of the Agreement, Akamai shall have the right to elect to continue providing Akamai Services to any Customer, subject to such Customer's consent, as a direct customer of Akamai, or indirectly through an authorized Akamai reseller, and to contact such Customers to discuss providing Akamai Services. Reseller and Sub-Reseller, as the case may be, shall provide such assistance as Akamai may reasonably request in the event it becomes necessary to transition Customers to Akamai as a result of such a termination or expiration of this Agreement.

2.5    **Use of Customer Information and Data Protection.** If required by national law, Reseller agrees, and shall cause Sub-Reseller to agree, to obtain and document Customers' specific consent for use of their Customer Content and data in accordance with and for the purposes contemplated in this Agreement. In the course of conducting its business, Akamai collects and processes certain information about its customers, business partners, prospects, suppliers and other business contacts. This information might include the name, business address, telephone number, e-mail address, and other information about an employee of one of these entities. As a global company, Akamai's business processes extend to more than one country and may result in worldwide processing and use of such data internally, and in appropriate circumstances, with Akamai's business partners and subcontractors. Reseller acknowledges and agrees, and shall cause Sub-Reseller to acknowledge and agree, that Akamai may use and share such information within its enterprise and with Akamai business partners and subcontractors to provide products and services to Customers. Reseller agrees, and shall cause Sub-Reseller to agree, to cooperate, and to secure Customer's cooperation, with Akamai to fulfill the legal requirements necessary, if any, to make such disclosures, use, and transfer of such information lawful.

3.    LICENSE; RESTRICTIONS.

3.1    License. Subject to all terms and conditions of this Agreement, Akamai grants to Reseller, the licenses as set forth on the Service Schedules to the extent any Software is provided by Akamai in connection with the applicable Akamai Service (Schedule B).

3.2    License Restrictions. Except as expressly provided herein, Reseller shall not appoint any other person, firm, or entity as a sub-distributor or agent for the Akamai Services. Reseller shall, and shall ensure that its Customers, use the Akamai Software for its or their internal purposes only, solely in conjunction with the applicable Akamai Service and in accordance with the related Service Schedule and Documentation. In no event shall Reseller authorize any Sub-Reseller to appoint any person, firm, or entity as a sub-distributor or agent for Akamai Services. Reseller shall not, and shall ensure that its Sub-Resellers or Customers shall not, for itself, any affiliate of Reseller or any third party, and shall not permit any Sub-Reseller for itself, any affiliate of Sub-Reseller or any third party to (i) sell, sublicense, assign, or transfer the Software, Akamai Services or any Documentation, except as expressly permitted under this Agreement; (ii) alter, modify or combine any aspect of the Akamai Software or Documentation; (iii) decompile, disassemble, or reverse engineer the Software, except to the limited extent permitted by applicable national law; (iv) copy the Software or Documentation, except as expressly permitted under this Agreement or to the limited extent permitted by applicable and mandatory national law; (v) remove from the Software or Documentation any language or designation indicating the confidential nature thereof or the proprietary rights of Akamai or its suppliers in such items; or (v) export or re-export the Akamai Software or Documentation outside of the territorial limits of the country in which it was originally delivered without appropriate licenses and clearances.

4.    MARKETING; PUBLICITY.

4.1    Co-Branded Service. Reseller agrees that, unless otherwise set forth on a particular Service Schedule, the Akamai Services to be marketed, resold and supported by Reseller and its Sub-Resellers, pursuant to the terms of this Agreement shall be co-branded as *"Akamai [Akamai Service name] Provided by [Reseller Name]"* or as otherwise mutually agreed upon by the parties.

4.2    Reseller's Marketing Efforts. Reseller shall use its reasonable commercially efforts to: (i) actively market, resell and support the Akamai Services to Customers in the Territory so as to maximize sales and; (ii) dedicate adequate resources, financial and otherwise, and maintain facilities and staff, to market, resell and support the Akamai Services in accordance with Reseller's obligations under this Agreement, in a timely, diligent and professional manner using competent personnel.

4.3    Promotional Materials; Marketing. Akamai will provide Reseller with a reasonable amount of sales and marketing literature in English relating to the Akamai Services. The exact form and quantity of such literature will be determined at Akamai's discretion. If Reseller elects not to use such standard literature, then the parties will endeavor to agree on the exact form of any customized literature to be used by Reseller, and once agreed to, Reseller will be solely responsible for all costs associated with the creation, reproduction and distribution of such customized literature. Reseller shall not, and shall not permit any Sub-Reseller to, make any representations or statements regarding the Akamai Services or the Software, other than those

contained in the sales and marketing literature and promotional materials provided to Reseller by Akamai, without the prior written approval of Akamai. Upon notice from Akamai, Reseller shall, and shall cause each Sub-Reseller to, discontinue use of any marketing literature or promotional materials that Akamai no longer deems acceptable.

4.4    **Translations.** The Reseller may translate or reproduce any marketing or promotional literature, brochures, or documentation relating to the Akamai Services into languages other than English only upon the prior written approval of Akamai. Reseller agrees to bear the cost of any such authorized translations, unless otherwise agreed upon by Akamai. Akamai shall own all right, title and interest in and to the copyright in each translation and Reseller shall own the tangible materials, i.e. brochures, provided that Reseller shall affix Akamai's copyright notice to all translations and copies at no cost to Akamai. Reseller may only engage a third party to provide any translation on terms that recognize fully Akamai's ownership of such materials. Reseller shall be liable for any errors and inaccuracies in such translations and shall indemnify Akamai in respect of any and all losses, expenses and damages Akamai may incur or sustain resulting from any such error or inaccuracy. Notwithstanding any translation undertaken in connection with this Section 4.4, the English language is and shall remain the official language version of any and all marketing or promotional literature, brochures, or documentation.

4.5    **Publicity.** During the Term, subject to the restrictions contained in this Agreement and Akamai's branding and marketing guidelines and restrictions, each party may post on its Web site the other party's logo and/or hyperlink to the other party's web site, use the other party's name in connection with proposals to other prospective customers and otherwise refer to the other party and the co-branded service offering contemplated hereby in print or electronic form for marketing or reference purposes provided that the form(s) of logo or tag line used by a party to represent the co-branded services shall be subject to the other party's approval. Either party's use, display or reference to the other party's proprietary indicia, trademarks, service marks, trade names, logos, symbols and/or brand names shall be subject to the advance written approval of that party, which approval shall not be unreasonably withheld. Subject to any restrictions placed upon Reseller, Sub-Reseller or Akamai by a Customer, Akamai shall be entitled to reference Customers who have contracted with Reseller or Sub-Reseller for an Akamai Service on Akamai's Web site and in marketing materials as an Akamai Services customer.

5.    TRAINING; CUSTOMER SUPPORT.

5.1    **Training.** The parties hereby agree to the training guidelines set forth under the "Training" section at http://i.am.akamai.com.

5.2    **Customer Support.** Unless otherwise provided in a specific Service Schedule, Akamai will provide Tier-2 technical support to Reseller for each Akamai Services as described in and in accordance with the provisions of the Akamai Support Schedule available under the "Products" section at http://i.am.akamai.com, which is incorporated herein by this reference, and may be amended by Akamai from time to time. Unless otherwise provided in a specific Service Schedule, Reseller will provide Tier-1 technical support directly to Sub-Resellers and Customers as described in and in accordance with the provisions of the Akamai Support Schedule available under the "Products" section at http://i.am.akamai.com, which is incorporated herein by this reference, and may be amended by Akamai from time to time. Upon the written request by an authorized Reseller representative directed to the appropriate Akamai point of contact, Akamai may provide technical support directly to a Sub-Reseller or Customer, subject to the right of Akamai to charge Reseller. Reseller shall keep Akamai promptly informed as to any problems

encountered by Reseller, Sub-Reseller or by Customers with the Akamai Services, and to communicate to Akamai in writing any resolution or proposed resolutions relating to such problems, via the proper points of contact as provided by Akamai. All technical support shall be provided in English and Reseller shall be responsible for ensuring that all of its representatives, Sub-Reseller representatives and Customer representatives who contact Akamai for technical support have sufficient ability in written and spoken English to benefit fully from the technical support.

6.    CONTENT RESPONSIBILITY; INTELLECTUAL PROPERTY RIGHTS.

    6.1    Customer Content.

        6.1.1    Customer Content. As between Akamai and Reseller, Reseller is and shall be solely responsible for and assumes all liabilities arising out of or related to any creation, renewal, updating, deletion, editorial content, control, publication, reproduction, and all other aspects of any files, software, scripts, multimedia images, graphics, audio, video, text, data or other objects or an event, including any third party content or materials, originating or transmitted from any Web site owned or operated by Reseller, Sub-Reseller or any Customer of Reseller or Sub-Reseller, and/or uploaded or routed to, passed through and/or stored on or within the Akamai Network or otherwise provided to Akamai or transmitted or routed using any of the Akamai Services provided hereunder ("Customer Content"). Without limiting the foregoing, Reseller shall and shall be responsible for ensuring its Customers, Sub-Reseller's Customers and Customer Content complies Akamai's acceptable use policy, as may be amended from time to time, available at www.akamai.com, as well as with all applicable laws, regulations and ordinances. In the event Reseller is or becomes aware or reasonably believes that Reseller, Sub-Reseller, Customer or any Customer Content violates Akamai's acceptable use policy or breaches any provision of this Agreement, Reseller shall notify Akamai in writing immediately and take all steps necessary to stop and remedy such violation or breach, including but not limited to preventing such Customer Content from being routed or passed through the Akamai Network. If Reseller, Sub-Reseller or any of their Customers fails to perform any of the foregoing, Akamai may immediately suspend any of the Akamai Services to Reseller, Sub-Reseller or such Customer and/or immediately terminate this Agreement, Notwithstanding anything herein to the contrary, Akamai reserves the right to refuse to provide Akamai Services to any Customer, to take steps to prevent any Customer Content from being routed to, passed through or stored on or within the Akamai Network or take other necessary action as set forth in Akamai's acceptable use policy, if Akamai becomes aware that Reseller, Sub-Reseller, their Customer or Customer Content is in violation of Akamai's acceptable use policy or otherwise in breach of this Agreement. This Agreement does not create a bailment of Customer Content and Akamai shall not be deemed a carrier, bailee, or warehouseman of any Customer Content under any circumstances.

        6.1.2    Availability of Web Site. Reseller, Sub-Reseller or their Customers shall be solely responsible for maintaining the availability of the Customer Web site(s), the connectivity of such Web site(s) to the Internet, and all Customer Content, IP addresses, domain names, hyperlinks, databases, applications and other resources necessary for Reseller or Customer to operate and maintain its Web site(s), including backups of any of the foregoing.

    6.2    Akamai Software and Services. As between Akamai and Reseller, Akamai shall own all right, title and interest in and to the Software, Documentation and the Akamai Services and any intellectual property rights therein throughout the world (collectively, the "Intellectual Property Rights"). Reseller acknowledges, and shall cause Sub-Reseller to acknowledge, that the Software, Documentation and Akamai Services constitute proprietary and

9

confidential information and trade secrets which are the sole and exclusive property of Akamai or its licensors and that the Software, Documentation and the Akamai Services are or may be protected by patent, copyright, trade secret and/or similar laws and certain international treaty provisions. This Agreement does not transfer or convey to Reseller, Sub-Reseller or any Customer or third party any right, title or interest in or to the Software, Documentation or the Akamai Services or any associated Intellectual Property Rights, but only a limited right of use revocable in accordance with the terms of this Agreement.

7.    INDEMNIFICATION.

7.1      Mutual Indemnification. Each party shall indemnify and hold the other, its assignees, agents, officers and employees harmless from and against any damages to real or tangible personal property and/or bodily injury to persons, including death, resulting from its or its employees' or agents' negligence or willful misconduct arising from or related to this Agreement.

7.2      Akamai Indemnification Obligations.

7.2.1    Akamai shall defend, indemnify and hold harmless Reseller from and against any suits, proceedings, assertions, damages, costs, liabilities or expenses (including court costs and reasonable legal fees) incurred as a result of claims or legal proceedings by a third party against Reseller and/or its affiliates, licensors, suppliers, subcontractors, officers, directors, employees and agents based upon a claim that any of the Software infringes any copyright or misappropriates any trade secret. Despite the provisions of this Section 7.2, Akamai has no obligation with respect to any claim of infringement that is based upon or arises out of: (i) any modification to the Software if the modification was not made by or at the written direction of Akamai; or (ii) the use or combination of the Software with any hardware, software, products, data or other materials not specified or provided by Akamai; or (iii) Reseller's, Sub-Reseller's or any Customer's use of the Akamai Services other than in accordance with the Documentation or Akamai's written directions or policies. If a claim of infringement under this Section 7.2 occurs, or if Akamai determines that a claim is likely to occur, Akamai will have the right, in its sole discretion, to either: (i) procure for Reseller and its Sub-Resellers and Customers the right or license to continue to use the Software free of the infringement claim; or (ii) replace or modify the Software to make it non-infringing provided that the replacement software substantially conforms to Akamai's then-current specifications for the Software. If these remedies are not reasonably available to Akamai, Akamai may, at its option, terminate this Agreement without liability, other than liability that may arise under Section 7.2, and Akamai shall return any fees paid by Reseller in advance in respect of Akamai Services not provided.

7.2.2    With respect to a claim covered by this Section 7.2, Reseller shall (i) promptly notify Akamai, in writing, of the suit, claim or proceeding or a threat of suit, claim or proceeding; (ii) at Akamai's reasonable request and expense, provide Akamai with reasonable assistance for the defense of the suit, claim or proceeding; and (iii) defer to Akamai to have shall sole control of the defense of any claim and all negotiations for settlement or compromise, except that Akamai shall not settle or compromise any claim without the prior written consent of Reseller, which consent shall not be unreasonably withheld or delayed.

7.3      Reseller Indemnification Obligations.

7.3.1    Reseller shall defend, indemnify, and hold harmless Akamai from and against any and all suits, proceedings, assertions, damages, costs, liabilities, or expenses

10

Case 1:05-cv-10132-DPW    Document 2-2    Filed 03/24/2005    Page 12 of 39

(including court costs and reasonable legal fees) incurred as a result of claims or legal proceedings of Customers, other third parties or government authorities against Akamai and/or its affiliates, licensors, suppliers, subcontractors, officers, directors, employees and agents arising from, connected with or relating to (i) any Customer Content, or Reseller's, Sub-Reseller's or Customer's web sites; (ii) misuse of the Akamai Services or Software (including unauthorized use, modification, or combination of the Software with any hardware, software, products, data, content or other materials not specified or provided by Akamai); (iii) violation of Akamai's acceptable use policy, or any applicable laws or regulations, and, (iv) misrepresentation by Reseller or Sub-Reseller with respect to the Akamai Services or Software.

       7.3.2    With respect to a claim covered by this Section 7.3 Akamai shall (i) promptly notify Reseller, in writing, of the suit, claim or proceeding or a threat of suit, claim or proceeding; (ii) at Reseller's reasonable request and expense, provide Reseller with reasonable assistance for the defense of the suit, claim or proceeding; and (iii) defer to Reseller to have sole control of the defense of any claim and all negotiations for settlement or compromise, except that Reseller shall not settle or compromise any claim without the prior written consent of Akamai, which consent shall not be unreasonably withheld or delayed.

## 8.    FEES; MINIMUM COMMITMENTS; PAYMENT TERMS.

       8.1    **Fees for Akamai Services.**  Reseller shall pay Akamai on a monthly basis the greater of (i) Reseller's Minimum Commitment set forth in Schedule E attached hereto or (ii) the aggregate amount of Reseller's and Sub-Reseller's Customer fees, calculated as set forth below ("Reseller Customer Fees"). Reseller Customer Fees shall be calculated as (i) Customer's monthly minimum commitment multiplied by the Reseller's Wholesale Price (as defined below) plus (ii) usage in excess of the Customer's minimum monthly commitment multiplied by the applicable excess usage rate. The "Wholesale Price" for each Akamai Services shall be an amount equal to the then-current list price ("List Price") for the applicable Akamai Service minus the applicable percentage discount ("Percentage Discount") as set forth on Schedule D (the "Fee Schedule"). Akamai's List Price for each Akamai Service, together with payment terms and conditions, shall be provided to Reseller on or before the Effective Date of this Agreement and shall be incorporated herein by this reference. Reseller hereby acknowledges and agrees, and shall cause Sub-Reseller to agree, that it shall comply with the standard terms and conditions for the resale of Akamai Services as set forth on each applicable List Price.

       8.2    **Adjustment to Fees.**  Reseller acknowledges and agrees, and shall cause Sub-Reseller to agree, that Akamai may increase or decrease the List Price or modify the pricing structure or methodology for the Akamai Services at any time in its sole discretion upon thirty (30) days advance notice to Reseller. In the event that Akamai changes the List Price for a particular Akamai Service, the Wholesale Price for such Akamai Services shall simultaneously be adjusted to maintain the Percentage Discount in effect as of the Effective Date of this Agreement. Notwithstanding the preceding sentence, to the extent the pricing structure or methodology is modified in accordance this Section 8.2, Akamai reserves the right to allocate different percentage discounts off the List Price for certain components of the Service offering; provided the amount of each percentage discount is mutually agreed upon by the parties.

Akamai Technologies, Inc. Confidential
Akamai Services Reseller Agreement – February, 2002

8.3    **Payment Terms; Taxes.** Unless otherwise set forth in Schedule D, all fees are in United States dollars and do not include sales, use, value-added or import taxes, customs duties or similar taxes that may be assessed by any jurisdiction. Reseller will be invoiced by Akamai as provided in the applicable Fee Schedule. Reseller is obligated to pay all fees regardless of whether Reseller has received payment from its Customers. Amounts due hereunder are payable 90 (90) days from the date of invoice for resellers existing Akamai customers as are listed under Schedule H and sixty (60) days from the date of invoice for any new customers signed after the date of this contract ("Invoice Due Date"). Reseller agrees to pay a late charge of 1.5 % for each month or part of the month (or the maximum lawful rate allowed by law, whichever is less) for all amounts not paid by the Invoice Due Date. If Reseller has not paid all amounts payable under this Agreement within ten (10) business days from the Invoice Due Date, the Program Managers for each of the parties shall meet and shall endeavor in good faith to resolve such Payment issues. If the Program Managers for each of the parties conclude in good faith that amicable resolution through continued discussions does not appear likely, then, at Reseller's request, the matter will be escalated to the Program Director or Vice President level within each of the companies, as agreed upon by the parties, and such senior management shall endeavor in good faith to resolve such disagreement. In no event will the parties resort to a formal proceeding if the disagreement is not resolved pursuant to the foregoing procedure.

Notwithstanding the above, following the ten (10) business days from the Invoice Due Date and during the time the parties strive to resolve the payment issue, the reseller will transfer all payments received from customers minus the relevant margin, for all customers whom payment sums are not in dispute.

. Reseller must notify Akamai of any disputed amount in writing within sixty (60) days of the Invoice Due Date; Invoice amounts not disputed within such sixty (60) day period are deemed accepted by Reseller. All taxes, withholdings, duties, fees and other governmental charges of any kind (including sales and use taxes, but excluding taxes based on the gross revenues or net income of Akamai) which are imposed by or under the authority of any government or any political subdivision thereof on the amounts charged by Akamai to Reseller under this Agreement shall be borne by Reseller and shall not be considered a part of, a deduction from or an offset against the fees charged to Reseller hereunder. If Reseller is required to pay any withholding tax, charge or levy in respect of any payments due to Akamai hereunder, Reseller agrees to gross up payments actually made such that Akamai shall receive sums due hereunder in full and free of any deduction for any such withholding tax, charge or levy. No part of any amount payable to Akamai hereunder may be reduced due to any counterclaim, set-off, adjustment or other right that Reseller may have against Akamai. If Reseller fails to pay any fee, expense, tax or any sum due Akamai, Reseller shall pay on demand all reasonable expenses incurred by Akamai in collecting these sums, including reasonable legal fees.

8.4    **Security Interest.** To secure all of its obligations under this Agreement, Reseller hereby grants to Akamai a security interest in all of Reseller's right, title and interest in and to all accounts receivable and all other rights to the payment of money for Akamai Services rendered to Customers, whether now or hereafter existing, or now owned or hereafter acquired or arising (collectively, the "Collateral"). Reseller represents and warrants that it will keep the Collateral free and clear of all security interests, liens and other encumbrances, except for the security interest in favor of Akamai granted hereby. Akamai may at any time and from time to time notify, or request Reseller to notify, in writing or otherwise, any account debtor or other obligor with respect to any of the Collateral to make payment to Akamai or its designee directly. In addition to any of Akamai's other rights and remedies, upon the occurrence of a default, Akamai

12

may exercise all rights of a secured party under the Uniform Commercial Code. For purposes of this Section 8.4, a "default" shall have occurred if Reseller shall have breached or failed to comply with any of the material terms of this Agreement and shall have not cured such breach or default within the cure period, if any, provided herein.

9.    REPRESENTATIONS AND WARRANTIES.

9.1    **Akamai's Representations and Warranties.** Akamai represents and warrants that: (i) Akamai and its licensors own or possess the necessary rights, title and licenses in and to the Software necessary to perform its obligations hereunder, (ii) Akamai has the right to enter into this Agreement and to perform its obligations hereunder, and (iii) Akamai has obtained any and all consents, approvals and other authorizations necessary for the performance of its obligations hereunder.

9.2    **Reseller's Representations and Warranties.** Reseller represents and warrants that: (i) Reseller has the right to enter into this Agreement and to perform its obligations hereunder, (ii) Reseller has obtained any and all consents, approvals, license, and other authorizations necessary for the performance of its obligations hereunder in accordance with all applicable laws, rules and regulations, (iii) all information required to be provided to Akamai hereunder is accurate, and (iv) Reseller will not be in breach of any other agreement or arrangement with a third party through its performance of its obligations hereunder.

9.3    WARRANTY DISCLAIMER. EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 9 BOTH PARTIES EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, TO THE FULLEST EXTENT PERMITTED BY LAW, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. RESELLER SHALL, AND SHALL CAUSE SUB-RESELLER TO, MAKE NO REPRESENTATIONS OR WARRANTIES ON AKAMAI'S BEHALF WITHOUT AKAMAI'S EXPRESS WRITTEN CONSENT.

10.    CONFIDENTIAL INFORMATION. All information disclosed by either party ("Disclosing Party") to the other party ("Receiving Party"), if disclosed in writing, labeled as proprietary or confidential, or if disclosed orally or to which the Receiving Party may obtain access otherwise than through the other party hereto, information which the Receiving Party reasonably knows or should know is proprietary or confidential (collectively, "Confidential Information"), shall remain the sole property of the Disclosing Party. Except for the specific rights granted by this Agreement, the Receiving Party shall not use any Confidential Information of the Disclosing Party for its own account. The Receiving Party shall use the highest commercially reasonable degree of care to protect the Disclosing Party's Confidential Information. Neither party shall disclose to third parties, other than its agents and representatives on a need-to-know basis and pursuant to the restrictions set forth in the following sentence, the terms of this Agreement or any Schedule hereto without the prior written consent of the other party, except either party shall be entitled to disclose (i) such terms to the extent required by law, and (ii) subject to Section 4.5, the existence of this Agreement. The Receiving Party shall not disclose Confidential Information to any third party without the express written consent of the Disclosing Party (except solely for the Receiving Party's internal business needs, to employees, consultants, agents and representatives who need to know such Confidential Information and who are bound by a written agreement with the Receiving Party or otherwise legally obligated to restrict the disclosure and use of such Confidential Information in a manner consistent with this Agreement and Disclosing Party hereby warrants that it will use its best efforts to enforce such agreement). The prohibitions contained in this Section 10 shall not apply to information that is: (i) available to the public other than by a

13

breach of this Agreement; (ii) rightfully received from a third party not in breach of an obligation of confidentiality; (iii) independently developed by the Receiving Party without access to Confidential Information; or (iv) known to the Receiving Party prior to the time of disclosure. Further, the Receiving Party may disclose Confidential Information produced in compliance with applicable law or a court order, provided the Disclosing Party is given reasonable prior notice of such law or order and an opportunity to attempt to preclude or limit such production. Subject to the above, the Receiving Party agrees to cease using any and all materials embodying Confidential Information, and to promptly return such materials to the Disclosing Party upon request.

11.    TERM AND TERMINATION.

11.1    **Term; Initial Term; Renewals.** This Agreement shall become effective as of the Effective Date and remain in full force and effect for two years (the "Initial Term"). Upon the expiration of the Initial Term, this Agreement will automatically renew for one or more additional terms of one year (each, a "Renewal Term") unless and until either party notifies the other party in writing of its intent to not renew at least ninety (90) days prior to the expiration of the Initial Term or ninety (90) days prior to the expiration of a Renewal Term. The Initial Term, together with any and all Renewal Terms, is sometimes collectively referred to as the "Term."

11.2    **Termination Upon Default.** Either party may terminate this Agreement in the event that the other party materially breaches or defaults in performing any obligation under this Agreement and such breach or default continues unremedied for a period of sixty (60) days following written notice of default, or as otherwise provided in specific provisions of this Agreement. The non-defaulting party may terminate this Agreement at any time after a material breach if such breach cannot be cured. Notwithstanding anything herein to the contrary, Akamai may, in its sole discretion, suspend or terminate this Agreement, in whole or in part, at any time if Reseller has not paid all amounts pertaining to an invoice within fifteen (15) days from the invoice due date and such amounts remain outstanding.

11.3    **Termination Upon Insolvency.** This Agreement shall terminate, effective upon delivery of written notice by a party: (i) upon the institution of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of debts of the other party; (ii) upon the making of an assignment for the benefit of creditors by the other party; or (iii) upon the dissolution or liquidation of the other party or proceeding similar to any of the foregoing under applicable law.

11.4    **Competitive Reseller Services.** If, within the first twelve (12) months following the Effective Date, Reseller or Sub-Reseller introduces a program directly or indirectly on behalf of any third party, that Akamai in its reasonable discretion deems to be competitive with any service Akamai is then offering, Akamai may terminate the Agreement without liability upon thirty (30) days written notice to Reseller.

11.5    **Effect of Termination.** The provisions of Sections 3.2, 4.5, 6, 7, 8.1, 8.2, 8.4, 9, 10, 11, 12, 13 and 14 shall survive termination of this Agreement. All other rights and obligations of the parties shall cease upon termination of this Agreement. If this Agreement is terminated for any reason other than Akamai's breach, Reseller shall pay to Akamai on or prior to the termination date all accrued fees outstanding as of the termination date and all Reseller's minimum dollar commitment obligations for the remainder of the Term. The term of any license or rights granted hereunder shall expire upon expiration or termination of this Agreement.

14

12.   DISPUTE RESOLUTION. In the case of any disputes, other than payment disputes, under this Agreement, the parties shall first attempt in good faith to resolve their dispute informally through the escalation process set forth below, or by means of commercial mediation, without the necessity of a formal proceeding.

| Reseller Employee Title | Akamai Employee Title | Time[*] |
|---|---|---|
| | Channel Manager | 15 business days |
| | Director, Channels | 15 business days |
| | Vice President, Sales | 15 business days |

13.   LIMITATION OF LIABILITY AND DAMAGES; INSURANCE.

13.1   Limitation of Liability. EXCEPT FOR LIABILITY ARISING OUT OF A PARTY'S INDEMNIFICATION, PAYMENT OR CONFIDENTIALITY OBLIGATIONS, BREACH OF WARRANTY OR WILLFUL MISCONDUCT, EACH PARTY'S LIABILITY FOR ALL CLAIMS ARISING OUT OF THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE, SHALL BE LIMITED TO THE AMOUNT OF FEES DUE AND PAYABLE BY RESELLER TO AKAMAI UNDER THIS AGREEMENT DURING THE PRECEDING SIX MONTHS.

13.2   Limitation of Damages. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY THIRD PARTY (INCLUDING ANY CUSTOMER OF RESELLER) FOR ANY LOSS OF DATA, LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, OR OTHER SPECIAL, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES ARISING FROM OR IN RELATION TO THIS AGREEMENT, THE SOFTWARE OR THE USE OF THE AKAMAI SERVICES, HOWEVER CAUSED AND REGARDLESS OF THEORY OF LIABILITY. THIS LIMITATION WILL APPLY EVEN IF SUCH PARTY HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

13.3   Exclusions. THE PROVISIONS OF SECTION 7 AND THIS SECTION 13 STATE THE SOLE AND EXCLUSIVE OBLIGATIONS AND LIMITATION OF LIABILITY OF BOTH PARTIES FOR ANY INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT OR MISAPPROPRIATION AND ARE IN LIEU OF ANY WARRANTIES OF NON-INFRINGEMENT, ALL OF WHICH ARE DISCLAIMED.

13.4   Insurance. Reseller shall, and shall cause Sub-Reseller to, maintain in effect during the Term, at Reseller's expense, comprehensive property (full replacement value), casualty and general liability insurance, including advertising, personal injury and contractual liability coverage ($2,000,000 per occurrence), media special perils liability, including multimedia coverage ($2,000,000 per occurrence) and other types and amounts, and covering such risks as are reasonable and customary for businesses engaged in a similar business and further levels of coverage as may be reasonably requested by Akamai. Such insurance coverage will be obtained from reputable insurance companies or associations and shall name Akamai, its subsidiaries and employees as additional insureds. Upon the request of Akamai, Reseller shall, and shall cause Sub-Reseller to, provide valid certificates of insurance. Reseller also shall, and shall cause Sub-Reseller to, ensure that each Customer maintains the same insurance throughout the term of Reseller's or Sub-Reseller's agreement with Customer.

14.   MISCELLANEOUS.

---

[*] The times periods set forth in this column shall be the time for escalation of a dispute from one level to the next. The escalation process shall commence upon receipt of written notice of a dispute.

15

**14.1    Compliance with Law.** Each party agrees to comply with all applicable laws, regulations, and ordinances relating to their performance hereunder. Reseller shall not, and shall cause Sub-Reseller to not, export, re-export or permit any third party to export or re-export, directly or indirectly, any Software or Documentation provided hereunder where such export or re-export is prohibited by U.S. law or any other applicable law without appropriate licenses and clearances.

**14.2    Accurate Records.** Akamai shall maintain complete and accurate records and log files for one year from the date on which they relate to support and document the fees charged to Reseller in connection with this Agreement. Reseller shall, and shall cause Sub-Reseller to, (i) maintain accurate records of all Customers to which Reseller or Sub-Reseller sells Akamai Services and sublicenses Software; (ii) maintain accurate records of all Customers to which Reseller or Sub-Reseller sells Akamai Services and sublicenses Software, including the names and addresses of such Customers, the date Akamai Services and Software were initially provided to Customers, and the Customer Agreements therefor; (iii) maintain accurate records of all support services provided to Customers; and (iv) provide to Akamai and maintain and update as necessary emergency contact information for each Customer. Reseller shall, and shall cause Sub-Reseller to, maintain complete and accurate records as required hereunder, and shall provide to Akamai upon request copies of all executed Customer Terms and Conditions.

**14.3    Notices.** Any notice required or permitted hereunder shall be made in English, in writing and delivered as follows (with notice deemed given as indicated): (i) by personal delivery when delivered personally; (ii) by established overnight courier upon written verification of receipt; (iii) by facsimile transmission when receipt is confirmed orally; or (iv) by certified or registered mail, return receipt requested, upon verification of receipt. All notices must be sent to the contact person for notices at the address listed on the cover page of this Agreement. Either party may change its contact person for notices and/or address for notice by means of notice to the other party given in accordance with this Section 14.2.

**14.4    Assignment.** Reseller may not without the prior written consent of Akamai assign, sub-license (other than to the extent expressly permitted hereunder) or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, either voluntarily or by operation of law, and any attempt to do so shall be a material default of this Agreement and such assignment shall be null and void. Any change of control in the ownership of Reseller shall be deemed an assignment for purposes hereof and Reseller shall provide Akamai with prior written notice of any such change of control in the ownership of Reseller. Akamai's rights and obligations, in whole or in part, under this Agreement may be assigned by Akamai upon notice to Reseller. Akamai's withholding of consent to assignment of this Agreement will be deemed to be reasonable if, including but not limited to, it is reasonably determined that the assignee is an actual or potential competitor of Akamai or the assignee does not meet Akamai's reasonable criteria for creditworthiness

**14.5    Third Party Beneficiaries.** This Agreement is solely for the benefit of the parties and their successors and permitted assigns, and, except as expressly provided herein or in any Schedule hereto, does not confer any rights or remedies on any other person or entity.

**14.6    No Agency.** Akamai and Reseller (for itself and each Sub-Reseller) each acknowledge and agree that the relationship established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to: (i) give either party the power to direct or control the day-to-day activities of the other; (ii) deem the parties to be acting as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking;

16

Akamai Technologies, Inc. Confidential
Akamai Services Reseller Agreement – February, 2002

or (iii) permit either party or any of either party's officers, directors, employees, agents or representatives to create or assume any obligation on behalf of or for the account of the other party for any purpose whatsoever.

**14.7    Governing Law.** This Agreement shall be interpreted according to the laws of the Commonwealth of Massachusetts without regard to or application of choice-of-law rules or principles. Any action to enforce, arising out of, or relating in any way to, any of the provisions of this Agreement may be brought and prosecuted in the exclusive jurisdiction of either the sate or federal courts located in the Commonwealth of Massachusetts as is provided by law; and the parties irrevocably consent to the personal and exclusive jurisdiction and venue of these courts located in the Commonwealth of Massachusetts and to service of process by registered mail, return receipt requested, or by other manner provided by law.

**14.8    Official Language.** This Agreement shall be executed in the English language. In case of any conflict between the English version and any translated version of this Agreement, the English language version shall govern.

**14.9    Currency.** References to "$" and/or "dollars" in this Agreement including the Schedules hereto are to United States dollars.

**14.10    Entire Agreement and Waiver.** This Agreement and any Schedules hereto shall constitute the entire agreement between Akamai and Reseller with respect to the subject matter hereof and all prior agreements, representations, and statement with respect to such subject matter are superseded hereby, including without limitation any non-disclosure agreement previously executed between the parties. The terms of this Agreement shall control in the event of any inconsistency with the terms of any Schedule hereto. This Agreement may be changed only by written agreement signed by both Akamai and Reseller. No failure of either party to exercise or enforce any of its rights under this Agreement shall act as a waiver of subsequent breaches; and the waiver of any breach shall not act as a waiver of subsequent breaches.

**14.11    Severability.** In the event any provision of this Agreement is held by a court or other tribunal of competent jurisdiction to be void, unenforceable, and/or otherwise unlawful, that provision will be enforced to the maximum extent permissible under applicable law, and the other provisions of this Agreement will remain in full force and effect. The parties further agree that in the event such provision is an essential part of this Agreement, they will negotiate in good faith with the aim of agreeing to a suitable replacement provision.

**14.12    Force Majeure.** Notwithstanding any other provision of this Agreement or the schedules hereto, if either party is prevented from performing any of its obligations under this Agreement due to an act of God, fire, flood, explosion, war, terrorism, strike, embargo, government regulation, civil or military authority, acts or omissions of carriers, transmitters, providers, vandals, or hackers, any failures or unavailability of third party networks, telecommunications links, websites, software, hardware or other technology or any cause beyond the party's reasonable control (a "force majeure event") the time for that party's performance will be extended for the period of the delay or inability to perform due to such occurrence; provided, however, that Reseller will not be excused from the payment of any sums of money owed by Reseller to Akamai; and provided further, however, that if a party suffering a force majeure event is unable to cure that event within thirty (30) days, the other party may terminate this Agreement.

**14.13    Counterparts.** This Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall be deemed an original, and all of which

17

shall constitute one and the same Agreement. If any counterpart or version of this Agreement shall be in any language other than English, the English counterpart or version will be authoritative.

14.14   Remedies. Except as provided herein, the rights and remedies of each party set forth in this Agreement are not exclusive and are in addition to any other rights and remedies available to it at law or in equity.

14.15   Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their respective successors and permitted assigns.

14.16.   Agreement to Governing Law. Reseller agrees, without objection, to the choice of law provision as set forth in Section 14.7 of this Agreement and to the dispute resolution provision as set forth in Section 12 of this Agreement.

15.   SECOND AMENDMENT AND RESTATEMENT OF THE AMENDED AND RESTATED RESELLER AGREEMENT. The Amended and Restated Reseller Agreement is hereby further amended and restated and superseded and replaced by this Second Amended and Restated Reseller Agreement, dated as of April 18, 2002.

Akamai Technologies, Inc. Confidential
Akamai Services Reseller Agreement – February, 2002

IN WITNESS WHEREOF, each of the parties, by its duly authorized representative, has entered into this Agreement as of the Effective Date.

AKAMAI TECHNOLOGIES, INC.                 ART-IN HOSTING AND SUPPORT SERVICES
                                          LTD.

By: _____            By: _____

Name: _P CPICIAYOS_____               Name: Diego Schaiquevich_____

Title: _SR DIR WW CHANNELS___             Title: CEO_____

Date: ___9/25/02_____             Date: September 25, 2002_____

                                          ארט אין
                                          שירותי ונמיכה ואיכסון בע״מ

                                          19

## List of Schedules

Schedule A          Akamai Services Reseller is authorized to resell
Schedule B          Service Schedule for each authorized Akamai Service
Schedule C          Territory
Schedule D          Reseller's Discount
Schedule E          Reseller's Existing Customer List

Akamai Technologies, Inc. Confidential

<u>Schedule A</u>

Akamai Services

Subject to all of the terms and conditions in this Agreement, Akamai authorizes Reseller to market, resell and support the following Akamai Services in which the box next to such Akamai Service is checked:

| Services | Description of Services |
|---|---|
| ☐ EdgeScape Services | The EdgeScape Services allow users the capability of identifying the country, state and/or region for an IP address of a user request to the user's Web site ("Identification Code(s)"). Use of the EdgeScape Services will also provide the user with certain network information from which such IP Address originates to the extent that such IP Address is initiated from networks that have been selected by Akamai to be included in the Service. Akamai is constantly mapping the Internet and collecting useful real-time data. This network mapping data (the "Database") is made available through EdgeScape to content providers who wish to improve the effectiveness and targeting of their Web site content. Refer to the *EdgeScape User's Guide* for a current list of networks. |
| ☐ EdgeSuite for Events | EdgeSuite for Events enables businesses to conduct successful Web events that scale to meet the traffic demands of the event, ensuring the Customer utilizes and pays only for what is needed. The expansive Akamai network ensures that Web events are delivered reliably while drastically improving performance and limiting infrastructure buildout. EdgeSuite for Events is for planned events only including new product launches and marketing initiatives. |
| ☐ EdgeSuite Services | EdgeSuite Services will (a) allow whole site delivery of Customer's web site(s) over the Akamai Network to web users accessing Customer's website(s) and (b) enable independent monitoring by Customer of certain aspects of the Akamai Network. |
| ☐ Enhanced DNS | Enhanced DNS provides enterprise web sites with a robust, reliable, and scalable DNS hosting solution to dependably direct end users to enterprise web site applications. Enhanced DNS is the only DNS hosting solution that leverages the Akamai Platform, requires no change to existing DNS administration processes, and provides unparalleled reliability, scalability, and performance of DNS resolutions. Two versions of the service are available, Enhanced DNS Global and Enhanced DNS. Enhanced DNS Global is sold as a standalone service or in conjunction with EdgeSuite Services. Enhanced DNS is sold ONLY in conjunction with EdgeSuite Services. |
| ☐ FreeFlow Services | FreeFlow Services will (a) allow Customer Content designated by Customer to be tagged for inclusion on the Akamai Network and delivered to web users accessing Customer's website(s) and (b) enable independent monitoring by Customer of certain aspects of the Akamai Network. |
| ☐ FreeFlow Streaming Services | FreeFlow Streaming Services will (a) allow Customer Content designated by Customer to be tagged for inclusion on the Akamai Network and delivered to web users accessing Customer's website(s) and (b) enable independent monitoring by Customer of certain aspects of the Akamai Network. |
| ☐ FirstPoint Services | FirstPoint Service maintains a complete, up-to-date map of the best routes around Internet outages, congestion, and other roadblocks. FirstPoint knows which of a Customer's mirrored sites is optimally suited to serve a request for content, and will direct a user's DNS requests to that site. |
| ☐ Log Delivery Service | The Akamai Log Delivery Service provides you with access to the server logs that are generated from the various Akamai services that you are using. It is a value-added service that puts you in control of getting the logs that are important to your core business. There are a number of configurable features that let you determine which logs you get and how you receive them. The Akamai Log Delivery Service addresses the following critical factors associated with Log Files: timeliness of logs, accuracy of log entries, and relevant log entries are delivered. Akamai's Log Delivery Service is available as a separately priced option with both FreeFlow and FreeFlow Streaming services. |
| ☐ SiteWise Services | SiteWise Service is a managed website reporting analysis service that allows customers to quickly access a wealth of information about their website usage and their users. SiteWise delivers valuable information that enables Customers to determine the success of their website, what type of traffic it is generating, and where their visitors come from. SiteWise provides reports geared towards various groups within a Customer's organization, including executives, eMarketing teams, web development teams and IT professionals. SiteWise may be sold as a standalone service and may also be offered as a feature of EdgeSuite Service. |

שירותי המחשב ואינטרנט בע"מ

Schedule B-1

Service Schedule for FreeFlow Services

1.      **Sublicense of Software.** Subject to all the terms and conditions of this agreement, Akamai grants to Reseller, during the Term, a limited, nontransferable and nonexclusive right to (i) sublicense the Akamaizer™ software (the "Software"), together with all related documentation (the "Documentation"), in object code form only, subject to the restrictions set forth below, to Customers in the Territory who purchase the FreeFlow Service from Reseller and (ii) display and use the Software and Documentation for the purpose of demonstrating the FreeFlow Services and providing support services to Customers as contemplated under this agreement.

2.      **Additional Obligations.** Reseller shall tag at least a substantial portion of the static images and graphics on its Web site using the FreeFlow Services. If as of the Effective Date Reseller has not purchased FreeFlow Services, Reseller and Akamai shall simultaneously with the signing of this Agreement execute Akamai's standard customer FreeFlow Services agreement whereby Reseller will purchase FreeFlow Service directly from Akamai. In addition, to indicate that the content of Reseller's Web site is being delivered by Akamai, Reseller agrees to place Akamai's logo along with the statement "Delivered by Akamai" on the home page of Reseller's Web site (such statement and logo are available in several sizes and in both gif and jpeg formats at the url: "http://www.akamai.com/customers/10_akamaized_logos.html" or such other url as provided by Akamai).

Akamai Technologies, Inc. Confidential

<u>Schedule B-2</u>

Service Schedule for FreeFlow Streaming Services

1.    Sublicense of Software: Subject to all the terms and conditions of this agreement, Akamai grants to Reseller, during the Term, a limited, nontransferable and nonexclusive right to (i) sublicense the Authentication software (the "Software"), together with all related documentation (the "Documentation"), in object code form only, subject to the restrictions set forth below, to Customers in the Territory who purchase Streaming Authentication as a feature of FreeFlow Streaming Services from Reseller and (ii) display and use the Software and Documentation for the purpose of demonstrating the FreeFlow Services and providing support services to Customers as contemplated under this agreement.

2.    Additional Obligations.

    (i)    Streaming Event Manager. Reseller agrees to designate an event manager, for each instance where the FreeFlow Streaming Services will be provided for an event, who is accountable for the satisfactory execution of services pursuant to the streaming of events and sustained usage streaming. Specific responsibilities of the event manager will include, but not be limited to, interfacing with Akamai event management personnel, scheduling Customer events, determining Customer event needs, allocating and/or procuring resources for Customer events (including Akamai and third-party professional services), and remaining on-call and available throughout the entire duration of any event to manage Customer inquiries and facilitate near real-time technical support.

    (ii)    Reseller as a FreeFlow Streaming Services Customer. If Reseller is granted the right to resell FreeFlow Streaming Services hereunder, Reseller shall stream all streaming media content on its Web site using FreeFlow Streaming Services. If as of the Effective Date Reseller has not purchased FreeFlow Streaming Services (for any content Reseller is streaming on it Web Site as of the Effective Date), Reseller and Akamai shall simultaneously with the signing of this Agreement execute Akamai's standard customer FreeFlow Streaming Services agreement whereby Reseller will purchase FreeFlow Streaming Services directly from Akamai. In addition, to indicate that the content of Reseller's Web site is being delivered by Akamai, Reseller agrees to place Akamai's logo along with the statement "Delivered by Akamai" on the home page of Reseller's Web site (such statement and logo are available in several sizes and in both gif and jpeg formats at the url: "http://www.akamai.com/customers/10_akamaized_logos.html" or such other url as provided by Akamai).

3.    Streaming Authentication. In the event that Reseller resells Streaming Authentication as a feature of EdgeSuite Services, Reseller acknowledges and agrees that Customers shall be solely responsible for (i) installing the Authentication Software on its storage server(s), (ii) creating, saving and applying access rules for Customer Content used with the Authentication Service, and (iii) approving end users who may access authenticated Customer Content including the generation of authenticated URLs for such end users. Akamai assumes no responsibility for the copying, redistribution or other use or misuse by third parties of Customer Content controlled using the Authentication Service. AKAMAI STREAMING AUTHENTICATION SERVICE DOES NOT GUARANTEE NETWORK SECURITY OR PREVENT SECURITY INCIDENTS. AKAMAI ACCEPTS NO RESPONSIBILITY, OR ANY LIABILITY FOR THE SECURITY OF YOUR ELECTRONIC ENVIRONMENT, WHETHER OR NOT AKAMAI HAS INSTALLED OR PROVIDES ANY SECURITY EQUIPMENT, SOFTWARE, OR SERVICE.

Schedule B-3

Service Schedule for FirstPoint Services

1.    Reseller's Responsibilities for FirstPoint Services Activation. Upon a Customer's purchase of FirstPoint Services, Reseller shall notify the Akamai Program Manager of complete shipping and contact information for any locations where Akamai may have to deploy network agent servers and the name of the Customer's website and a list of the properties (sub-domains) for the Customer. Reseller acknowledges that Customer shall be responsible for securing and paying for sufficient rack space and bandwidth as well as installing network agent servers in locations where Customer is either self-hosted or where Akamai does not already have rack space reserved for its FirstPoint Services.

2.    Additional Rights and Obligations.

    (i)    Restriction on Combination of FirstPoint Services.  To the extent Reseller or Customer is using the FirstPoint Services, neither the Reseller nor the Customer shall create a service that combines FirstPoint Services with a non-Akamai accelerated content delivery service similar to the FreeFlow Services or the FreeFlow Streaming Services without the prior written consent of Akamai.

    (ii)    Restriction on Number of Data Centers.  Use of the FirstPoint Services is restricted to a maximum of five (5) data centers per Customer, with a maximum of five Properties per data center. For purposes of this Agreement, "Properties" shall mean entities and unique or distinct services offered by a Customer at one website which controls, are controlled by, or are under common control with Customer.

    (iii)    Equipment.  Reseller acknowledges that Akamai will own and maintain any and all equipment that are provided to Customer in conjunction with activation and use of FirstPoint Services. As between Reseller and Akamai, Reseller shall be responsible for any damage to the equipment caused by Reseller's Customer.

Schedule B-4

Service Schedule for EdgeScape Services

1.    Sublicense of Software. Subject to all terms and conditions of the Reseller Agreement, Akamai grants to Reseller during the Term the non-exclusive, nontransferable, revocable right and license to sublicense the EdgeScape Application Program Interface™ software ("EdgeScape API") in source code form, and the EdgeScape Engine™ software ("EdgeScape Engine") in object code form only (collectively, the "EdgeScape Software"), together with all related documentation in English ("Documentation"), directly to Customers in the Territory who purchase the EdgeScape Services from Reseller. For purposes of the Reseller Agreement, the EdgeScape Software shall be considered "Software" as defined in the Reseller Agreement. All rights in and to the Akamai Software not specifically granted to Reseller are hereby reserved to Akamai.

2.    Software Restrictions. The foregoing license (i) grants Reseller the right to sublicense to Customers the right to install and use the EdgeScape Software on Customer's servers and (ii) are subject to the following restrictions: The Reseller and/or Customer, as applicable, shall (a) access the Database only through the use of the EdgeScape Software, (b) not integrate the Identification Code(s) or any other data obtained from the Database with any of its databases, and (c) not use the EdgeScape Services or the EdgeScape Software to provide a managed identification service that competes with Akamai's EdgeScape Services. Reseller may sublicense the EdgeScape Engine directly to Customers either (a) on an individual basis or (b) on a shared basis. On an individual basis, the EdgeScape Engine may be provided to Customer directly or stored on Reseller's servers and access thereto is dedicated solely to a particular Customer. On a shared basis, the Engine shall be stored on Reseller's servers and access thereto shall be shared among more than one Customer, provided that such EdgeScape Engine's access rate must be at least 600 Transactions per second for each Customer to whom such EdgeScape Engine is allocated. A "Transaction" as used in the preceding sentence shall mean the lookup of an end-user IP address in the EdgeScape Services database that returns the corresponding geographic and network information as a result of a page impression, ad serve or related Web content delivery action that was triggered by an end-user's request for such content.

3.    Audit Request. Reseller shall establish and maintain during the Term and one (1) year period thereafter, in accordance with appropriate industry practice, mechanisms for tracking Customers (and license granted thereto) and creating and maintaining records relevant to the determination of the amounts due to Akamai under this Agreement. During the Term and the one (1) year period thereafter, Akamai shall have the right to engage, at its own expense, an independent auditor to examine Reseller's records and logs related to the determination of the amounts due under this Agreement. Akamai shall not perform an audit more than once per calendar quarter (unless Akamai reasonably believes Reseller is not in compliance with this Agreement) to confirm Reseller's compliance with the requirements of this Agreement. If any audit conducted on behalf of Akamai shall show that Reseller underpaid amounts due to Akamai hereunder, then Reseller shall immediately pay to Akamai any such deficiency with interest thereon at a rate equal to the lower of one and a half percent (1.5%) per month or at such lower rate as shall be the maximum rate permitted by law from the date due until paid. Reseller agrees to reasonably cooperate in any audit including but not limited to providing Akamai's designated audit or inspection team access to the relevant Reseller records, logs and facilities. Akamai shall bear all costs associated with an audit unless any such audit reveals that Reseller has understated the payment due to Akamai under this Agreement, in which case Reseller shall pay all reasonable costs and expenses of such audit.

## Schedule B-5

### Service Schedule for EdgeSuite Services

1.    **Sublicense of Software:** Subject to all the terms and conditions of this agreement, Akamai grants to Reseller, during the Term, a limited, nontransferable and nonexclusive right to (i) sublicense the Authentication software (the "Software"), together with all related documentation (the "Documentation"), in object code form only, subject to the restrictions set forth below, to Customers in the Territory who purchase Streaming Authentication as a feature of EdgeSuite Services from Reseller and (ii) display and use the Software and Documentation for the purpose of demonstrating the FreeFlow Services and providing support services to Customers as contemplated under this agreement.

2.    **Additional Obligations.** Reseller shall deliver all the content of its Web site using EdgeSuite Services. If as of the Effective Date of this Agreement, Reseller has not purchased EdgeSuite Services, Reseller and Akamai shall simultaneously with the signing of this Agreement execute Akamai's standard customer EdgeSuite Services agreement whereby Reseller will purchase EdgeSuite Service directly from Akamai. In addition, to indicate that the content of Reseller's Web site is being delivered by Akamai, Reseller agrees to place Akamai's logo along with the statement "Delivered by Akamai" on the home page of Reseller's Web site (such statement and logo are available in several sizes and in both gif and jpeg formats at the url: "http://www.akamai.com/customers/10_akamaized_logos.html" or such other url as provided by Akamai).

3.    **Recursion.** Reseller shall ensure that Customer shall turn off recursion on its authoritative name server(s). For each host name to which the EdgeSuite Services shall apply, Reseller shall ensure that Customer modifies its name server to set up a CNAME record to alias such host name to the Akamai Network.

4.    **Secure content Delivery.** In the event that Reseller resells Secure Content Delivery as part of EdgeSuite Services, Reseller shall ensure that Customers shall provide their SSL certificate(s) (the "Certificates") to Akamai to facilitate Secure Content Delivery. The Certificate(s) shall be deemed Confidential Information within the meaning set forth in the Reseller Agreement. The Certificate(s) will be stored in a single highly secure location controlled by Akamai. Akamai deployed servers shall maintain the Certificate(s) in memory only and shall not make any copies thereof for any purpose other than to facilitate Secure Content Delivery.

5.    **Streaming Authentication.** In the event that Reseller resells Streaming Authentication as a feature of EdgeSuite Services, Reseller acknowledges and agrees that Customers shall be solely responsible for (i) installing the Authentication Software on its storage server(s), (ii) creating, saving and applying access rules for Customer Content used with the Authentication Service, and (iii) approving end users who may access authenticated Customer Content including the generation of authenticated URLs for such end users. Akamai assumes no responsibility for the copying, redistribution or other use or misuse by third parties of Customer Content controlled using the Authentication Service. AKAMAI STREAMING AUTHENTICATION SERVICE DOES NOT GUARANTEE NETWORK SECURITY OR PREVENT SECURITY INCIDENTS. AKAMAI ACCEPTS NO RESPONSIBILITY, OR ANY LIABILITY FOR THE SECURITY OF YOUR ELECTRONIC ENVIRONMENT, WHETHER OR NOT AKAMAI HAS INSTALLED OR PROVIDES ANY SECURITY EQUIPMENT, SOFTWARE, OR SERVICE.

## Schedule B-6

### Service Schedule for SiteWise Services

1.      **Sublicense of Software.** Subject to all the terms and conditions of this agreement, Akamai grants to Reseller, during the Term, a limited, nontransferable and nonexclusive right to (i) sublicense the Site Code (the "Software"), together with all related documentation (the "Documentation"), in object code form only, subject to the restrictions set forth below, to Customers in the Territory who purchase the SiteWise Services from Reseller, (ii) install, or allow its Customer's to install, the Site Code on the applicable HTML Pages, (iii) collect, store and use, or allows its Customers to collect, store and use, the Usage Data and Reports, and (iv) display and use the Software and Documentation for the purpose of demonstrating the SiteWise Services and providing support services to Customers as contemplated under this Agreement.

2.      **Additional Obligations.** Reseller acknowledges that the Customer web servers on which the SiteWise Services will be performed must be capable of supporting JavaScript. In addition, Reseller acknowledges that Akamai can only gather data on users accessing those HTML web pages that have been selected to be tracked ("HTML Pages") whose browsers are JavaScript 1.1 compliant. Reseller or Customer shall be responsible for installing a few lines of JavaScript code provided by Akamai (the "Site Code") on each of the HTML Pages. Reseller or Customer shall install the Site Code by either (i) manually inserting such Site Code into the applicable HTML Pages or (ii) such other method agreed to by Akamai and Reseller or Customer.

3.      **Reports; Usage Data.** Akamai shall gather usage information on a Customer's web site on behalf of the Customer and provide such data to the Customer in a series of reports and tables (the "Reports") accessible by the Customer through the Akamai Portal. Currently, the usage information, when available, shall consist of Uniform Resource Locators ("Urls") of page request, browser name, browser version, operating system, operating system version, screen width (pixels), screen depth (bits per pixel), screen height (pixels), installed Netscape plug-ins, content location response header, origin server of request Urls, time of last page modification, referrer, and other usage information developed from time to time ("Usage Data"). Reports for Usage Data shall be available for up to twelve (12) months after the creation of such Usage Data.

4.      **Intellectual Property Rights.** As between Customer and Akamai, Customer shall own all right, title and interest in and to any Reports and Akamai shall own all right, title and interest in and to the Site Code, SiteWise Services, and SiteWise Documentation. Reseller acknowledges that the Reports and Usage Data shall be the property of their Customers and not Reseller. Accordingly, Reseller hereby agrees that it will use such Reports and Usage Data solely for the purpose of providing the SiteWise Services to Customers and that it will not use such Reports or Usage Data for any other purpose, including without limitation for the purpose of aggregating or correlating such data among Customers for its own use or for the purpose of creating a separate service offering.

5.      **Integration Services.** Customer integrations may be performed either (i) by Akamai upon request by Reseller (to the extent that Akamai reasonably has resources available at the time of request) or (ii) by Reseller in the event that Reseller opts to undergo the integration consultant training described below. The work associated with Customer integrations is detailed on Attachment 1 ("Integration Services"). With respect to Integration Services provided by Akamai, Reseller shall be responsible for arranging and hosting all conference calls at mutually convenient times for all parties involved, and for generally taking care of such administrative and other incidental tasks as Akamai from time to time reasonably requests.

6.   **Integration Consultant Training.** Reseller may, at its option, elect to undergo integration consultant training so that Reseller is able to perform SiteWise customer integrations without Akamai assistance. In the event that Reseller opts to undergo such training, it will so notify Akamai promptly upon execution of this Agreement and Akamai will provide formal SiteWise Integration training to Reseller's Integration consultants within thirty (30) days of the execution of this Letter at a mutually convenient time. This training will be led remotely using training materials provided by Akamai.

Akamai Technologies, Inc. Confidential

Attachment 1

Integration Services

## Standard SiteWise Integrations

This following is a description of the work associated with the SiteWise Integration Services fee for standard customer integrations. Integration Services generally involve a telephone-based knowledge transfer exercise that pairs the customer team tasked with implementing SiteWise with an experienced Akamai consultant. The goal of the integration program is to provide a high level overview of the product and get the customer off and running.

The Akamai consultant will begin by delivering some high level training, will introduce the customer team to the SiteWise documentation and will then answer questions while guiding the customer team through creating their first report.

## The Specific Tasks

- Set Up and Initialize the SiteWise Service
- Create the customer account
- Set-up Portal access
- Review SiteWise documentation
- Knowledge transfer
- Introduction of SiteWise reporting
- Deploying SiteWise code
- Customizing SiteWise
- Creating test objects
- Tuning and optimizing services

## Schedule B-7

### Service Schedule for Enhanced DNS

1.    **Additional Obligations.**  Reseller shall not combine the Enhanced DNS Service with a non-Akamai accelerated content delivery service similar to Akamia's EdgeSuite, FreeFlow or FreeFlow Streaming services without the prior written consent of Akamai. Reseller shall ensure that: (i) Customer shall not provision more then 10 DNS zones with an aggregate maximum of 2,500 DNS resource records if subscribing to the Enhanced DNS Service (ii) Customer shall not provision more then 25 DNS zones with an aggregate maximum of 6,250 DNS resource records if subscribing to the Enhanced DNS Global Service and, (iii) Customer shall not utilize more than 20 DNS zone transfers per day per DNS zone.

Akamai Technologies, Inc. Confidential

<u>Schedule B-8</u>

Service Schedule for Log Delivery Service

1.    **Additional Obligations.**  Reseller shall ensure that Customers are responsible for appropriately
configuring Customers' e-mail and/or FTP server(s) in order to receive log files through log delivery.

Schedule C

Territory

Israel
Italy (For Reseller Only; Not for Sub-Resellers)
United States of America (For Companies Head Quartered in Israel
Only)

Schedule – D

The wholesale price charge to reseller shall be the then current applicable list price as published for each territory, less a discount as set for bellow:

Free flow: 1,195$, flat cost per committed Mbps

Free flow streaming, 0.01$ flat cost per committed mb

First point 35% (thirty five)

Edgescape 35% (thirty five)

Edgesuite 35% (thirty five)

Sitewise -TBD

Enhanced DNS 35% (thirty five)

Edgesuite for events 35% (thirty five)

Akamai Technologies, Inc. confidential.

D.S

ארט אין
שירותי ונמיכה ואיחסון בע"מ

## Schedule E

Existing customer list - Customers whom are customers of the reseller prior to signing the renewal contract.

Ynet
Babylon
Aish
Yellow Pages
Magic Software
Idex Online

Akamai Technologies, Inc. Confidential

*EXHIBIT B*



February 18, 2003

Art-In Technologies & Electronic Commerce Ltd
15 Bezalel St.
Ramut-Gan 52521 ISRAEL
Fax: 011-972-3-6111712
Attn: Diego Schaiquevich
        Roy Segev

Ben-Shahar, Lekner & Co. Law Offices,
        as Temporary Receivers
2, Hashlosha St.
Tel-Aviv 67060 ISRAEL
Fax: 011-972-6883382-3
Attn: Lior Kwintner, Adv.
        Aharon Ben Shahar, Adv., Temporary Receiver

Re:    Termination of Second Akamai Services Reseller Agreement dated as of April
        18, 2002 ("Reseller Agreement")

Gentlemen:

        This letter is to inform you that, effective today, Akamai Technologies, Inc. is exercising its right to terminate the Reseller Agreement pursuant to Section 11.2 and Section 11.2 of that Agreement. We note that each of these grounds is itself a sufficient basis on which to terminate.

        Our decision to terminate the Reseller Agreement is a business necessity compelled by Art-In's continued refusal to pay the substantial overdue amounts owed to us. We have worked for several months now in good faith to try to resolve these issues but have received no cooperation from Art-In or the Temporary Receiver.

        Art-In will be receiving a final invoice for amounts owed under the Reseller Agreement shortly. Please remember that Akamai reserves the right to pursue any remedies available to us in order to collect these amounts due in full.

                                        Sincerely,

                                        John Sconyers
                                        Senior Director Channel Sales

cc:    Akamai General Counsel

Akamai Technologies, Inc. 500 Technology Square, Cambridge, MA 02139
Tel 877-425-2624 or 617-444-3000 Fax 617-444-3001
www.akamai.com

*EXHIBIT C*

# Art-In Unpaid Invoice Summary

| Invoice Number | Inv Amount | Total Amount of Payments/Adjustments | Unpaid Balance |
|---|---|---|---|
| 1-8GGE3-2001011302 | 43,366.94 | | 43,366.94 |
| 1-8GGE3-20010214415 | 29,875.00 | 3,739.94 | 26,135.06 |
| 1-8GGR3-20010418737 | 38,198.36 | 33,527.84 | 4,670.52 |
| 1-8GGE3-20010521114 | 74,854.80 | 40,984.72 | 33,870.08 |
| 1-8GGE3-20010626217 | 86,639.20 | | 86,639.20 |
| 1-8GGE3-20010729032 | 119,500.00 | 21,421.00 | 98,079.00 |
| 1-8GGE3-20010832077 | 119,500.00 | 9,391.43 | 110,108.57 |
| 1-8GGE3-20010935221 | 59,353.73 | 45,895.91 | 13,457.82 |
| 11036446 | 15,476.90 | 13,237.19 | 2,239.71 |
| 11139678 | 11,282.77 | 5,430.90 | 5,851.87 |
| 11242255 | 28,519.81 | 28,244.81 | 275.00 |
| 20144288 | 34,340.17 | 25,821.34 | 8,518.83 |
| 20348259 | 24,748.70 | 23,097.70 | 1,651.00 |
| 20551885 | 32,328.89 | 21,969.20 | 10,359.69 |
| 20653672 | 23,186.70 | 21,101.70 | 2,085.00 |
| 20755436 | 39,108.42 | 39,063.42 | 45.00 |
| 20857234 | 28,897.44 | 28,857.44 | 40.00 |
| 20959071 | 49,992.99 | 10,710.14 | 39,282.85 |
| 21060849 | 36,441.56 | | 36,441.56 |
| 21162636 | 35,121.73 | | 35,121.73 |
| 21264396 | 45,756.07 | | 45,756.07 |
| 30166128 | 36,498.82 | | 36,498.82 |
| 30268918 | 31,466.26 | | 31,466.26 |
| | 1,044,455.26 | 372,494.68 | 671,960.58 |